UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- x

AMERICAN CIVIL LIBERTIES UNION et al.,

                          Plaintiffs,

           v.

UNITED STATES DEPARTMENT OF JUSTICE,

                        Defendant.

--------------------------------------------------------- x

13 Civ. 7347 (GHW)

**Memorandum of Law in Support of the Government's Motion
for Partial Summary Judgment**

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street
New York, New York 10007
Telephone: 212.637.2703
Fax: 212.637.2702
E-mail: benjamin.torrance@usdoj.gov

BENJAMIN H. TORRANCE
Assistant United States Attorney

     – Of Counsel –

## Table of Contents

Preliminary Statement .................................................................................................................. 1

Background .................................................................................................................................. 1

   A.   Surveillance and Notification Under FISA ..................................................................... 1

      1.   The Foreign Intelligence Surveillance Act of 1978 ........................................... 1

      2.   The FISA Amendments Act of 2008 .................................................................. 2

      3.   The Government's Notification Practices Regarding Information Obtained or Derived from Both Traditional FISA and FAA Surveillance .................................................. 3

   B.   The ACLU's FOIA Requests and Lawsuit ..................................................................... 5

   C.   DOJ's Searches for Responsive Records ......................................................................... 7

      1.   NSD ................................................................................................................... 7

      2.   U.S. Attorney's Offices ..................................................................................... 9

   D.   Documents Indexed and Withheld .................................................................................. 11

ARGUMENT .............................................................................................................................. 13

   A.   Legal Standards .............................................................................................................. 13

   B.   DOJ Properly Construed the FOIA Request ................................................................... 14

   C.   DOJ's Search for Responsive Records Complied with FOIA ........................................ 17

   D.   The Records Were Properly Withheld Under Exemption Five ....................................... 20

      1.   The Deliberative Process Privilege Applies ...................................................... 21

      2.   The Attorney-Client Privilege Applies ............................................................. 23

      3.   The Work Product Privilege Applies ................................................................. 24

Conclusion .................................................................................................................................. 25

# Table of Authorities

*Cases*:

*A. Michael's Piano, Inc. v. FTC,*
   18 F.3d 138 (2d Cir. 1994)...........................................................................24

*Adamowicz v. IRS,*
   552 F. Supp. 2d 355 (S.D.N.Y. 2008)...........................................................14

*Amnesty Int'l v. CIA,*
   728 F. Supp. 2d 479 (S.D.N.Y. 2010)...........................................................14

*Amnesty Int'l v. CIA,*
   No. 07 Civ. 5435, 2008 WL 2519908 (S.D.N.Y. June 19, 2008)..................20

*Brinton v. Department of State,*
   636 F.2d 600 (D.C. Cir. 1980)......................................................................21

*Campbell v. DOJ,*
   164 F.3d 20 (D.C. Cir. 1998)........................................................................18

*Carney v. DOJ,*
   19 F.3d 807 (2d Cir. 1994)......................................................................13, 17

*Center for Nat'l Sec. Studies v. DOJ,*
   331 F.3d 918 (D.C. Cir. 2003)......................................................................13

*Church of Scientology of California v. IRS,*
   792 F.2d 146 (D.C. Cir. 1986)......................................................................19

*Clapper v. Amnesty International,*
   133 S. Ct. 1138 (2013).................................................................................2, 3

*Coastal States Gas Corp. v. Dep't of Energy,*
   617 F.2d 854 (D.C. Cir. 1980)................................................................15, 16

*Cooper v. Stewart,*
   763 F. Supp. 2d 137 (D.D.C.), *aff'd,* 2011 WL 6758484 (D.C. Cir. 2011)............20

*Department of the Interior v. Klamath Water Users Protective Ass'n,*
   532 U.S. 1 (2001).......................................................................13, 16, 21, 22

*Dockery v. Gonzales,*
   524 F. Supp. 2d 49 (D.D.C. 2007)................................................................20

*Electronic Privacy Information Center v. NSA,,*
   678 F.3d 926 (D.C. Cir. 2012)......................................................................17

*Elliott v. U.S. Dept. of Agriculture,*
   506 F. Supp. 2d 1 (D.D.C. 2007), *aff'd,* 2008 WL 4682666 (D.C. Cir. 2008)...........20

*Fitzgibbon v. U.S. Secret Service,*
   747 F. Supp. 51 (D.D.C. 1990)....................................................................20

*Fox News Network, LLC v. Dep't of the Treasury,*
   739 F. Supp. 2d 515 (S.D.N.Y. 2010)...........................................................15

*Goland v. CIA*,
    607 F.2d 339 (D.C. Cir. 1979).............................................................................. 17, 18

*Grand Central Partnership, Inc. v. Cuomo*,
    166 F.3d 473 (2d Cir. 1999)................................................................. 15, 17, 21, 22

*Halpern v. FBI*,
    181 F.3d 279 (2d Cir. 1999).................................................................................... 18

*Hodge v. FBI*,
    703 F.3d 575 (D.C. Cir. 2013)................................................................................. 17

*Hopkins v. HUD*,
    929 F.2d 81 (2d Cir. 1991)................................................................................ 21, 22

*In re Country of Erie*,
    473 F.3d 413 (2d Cir. 2007)................................................................................... 24

*In re Grand Jury Investigation*,
    399 F.3d 527 (2d Cir. 2005)................................................................................... 23

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989)............................................................................................... 13

*Kowalczyk v. DOJ*,
    73 F.3d 386 (D.C. Cir. 1996)................................................................................. 14

*Landmark Legal Found. v. EPA*,
    272 F. Supp. 2d 59 (D.D.C. 2003)........................................................................ 14

*Miller v. CIA,*,
    730 F.2d 773 (D.C. Cir. 1984)............................................................................... 14

*Miscavige v. IRS*,
    2 F.3d 366 (11th Cir. 1993)................................................................................... 13

*Nation Magazine v. U.S. Customs Service*,
    71 F.3d 885 (D.C. Cir. 1995)................................................................................. 14

*National Council of La Raza v. DOJ*,
    411 F.3d 350 (2d Cir. 2005)............................................................................ 21, 23

*New York Times, Inc. v. DOJ*,
    __ F.3d __, No. 13-422, 2014 WL 2838861 (2d Cir. June 23, 2014)..................... 17

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975)......................................................................................... passim

*Oglesby v. Dep't of the Army*,
    920 F.2d 57 (D.C. Cir. 1990)............................................................................ 17, 18

*Renegotiation Bd. v. Grumman Aircraft Engineering Corp.*,
    421 U.S. 168 (1975)............................................................................................... 21

*Tigue v. DOJ*,
    312 F.3d 70 (2d Cir. 2002)....................................................................... 15, 21, 22, 23

*United States v. Adlman,*
    134 F.3d 1194 (2d Cir. 1998).................................................................................. 25

*United States v. Williams,*
    553 U.S. 285 (2008)............................................................................................... 16

*Upjohn v. United States,*
    449 U.S. 383 (1981)........................................................................................... 24, 25

*Valencia-Lucena v. U.S. Coast Guard,*
    180 F.3d 321 (D.C. Cir. 1999).............................................................................. 18

*Weisberg v. DOJ,*
    705 F.2d 1344 (D.C. Cir. 1983)............................................................................ 14

*World Publishing Co. v. DOJ,*
    672 F.3d 825 (10th Cir. 2012).............................................................................. 13

*Statutes*:

5 U.S.C. § 552(a)(3)...................................................................................... 14, 19, 20

5 U.S.C. § 552(b)(5).............................................................................................. 6, 20

50 U.S.C. § 1801...................................................................................................... 1, 2

50 U.S.C. § 1806................................................................................................... 2, 3, 7

50 U.S.C. § 1881a........................................................................................................ 3

50 U.S.C. § 1881e....................................................................................... 3, 5, 11, 14

*Rules*:

Fed. R. Civ. P. 26(b)(3)............................................................................................. 24

Fed. R. Civ. P. 56(a)................................................................................................. 13

## Preliminary Statement

Defendant the Department of Justice ("DOJ" or the "Department") respectfully submits this memorandum in support of its motion for partial summary judgment.

In this action under the Freedom of Information Act, plaintiff the American Civil Liberties Union ("ACLU") seeks to compel disclosure of DOJ's "policies, procedures, and practices" as well as legal memorandums, governing certain disclosures regarding foreign intelligence. The DOJ has, in fact, publicly explained its policies, procedures, and practices regarding those disclosures, and, after a thorough search in this case across multiple DOJ components and subcomponents, disclosed other documents. Certain records, however, were created by the Department's lawyers as part of a process of policy deliberation and provision of legal advice, and accordingly were withheld on the ground of privilege. Dissatisfied with what they received, the ACLU now seeks to challenge both the reasonableness of the search and the applicability of the privileges. But the Department's search was adequate, and the records at issue fall squarely within the scope of the three distinct privileges DOJ has asserted. Summary judgment should therefore be granted to the government.

## Background

**A.   Surveillance and Notification Under FISA**

**1.   The Foreign Intelligence Surveillance Act of 1978**

The Foreign Intelligence Surveillance Act of 1978 ("FISA"), 50 U.S.C. § 1801 *et seq.*, was enacted "to regulate the use of electronic surveillance within the United States for foreign intelligence purposes," S. Rep. No. 95-604, at 7 (1977), primarily by placing certain types of foreign intelligence surveillance under the oversight of the Foreign Intelligence Surveillance

Court ("FISC"). *See Clapper v. Amnesty International*, 133 S. Ct. 1138, 1143 (2013). Title I of FISA authorizes forms of electronic surveillance, while Title III authorizes physical searches.

As relevant to this case, information acquired under FISA may be used, with certain limitations, in criminal proceedings with the authorization of the Attorney General. 50 U.S.C. § 1806(a), (b). When the government intends to use "information obtained or derived" from FISA surveillance against an "aggrieved person," it must provide notice:

> Whenever the Government intends to enter into evidence or otherwise use or disclose in any trial, hearing, or other proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, against an aggrieved person, any information obtained or derived from an electronic surveillance of that aggrieved person pursuant to the authority of this subchapter, the Government shall, prior to the trial, hearing, or other proceeding or at a reasonable time prior to an effort to so disclose or so use that information or submit it in evidence, notify the aggrieved person and the court or other authority in which the information is to be disclosed or used that the Government intends to so disclose or so use such information.

*Id.* § 1806(c). An "aggrieved person" means "the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance." *Id.* § 1801(k).

**2.   The FISA Amendments Act of 2008**

In 2008, Congress enacted the FISA Amendments Act ("FAA") as Title VII of FISA, which "establish[es] a new and independent source of intelligence collection authority, beyond that granted in traditional FISA." *Amnesty Int'l*, 133 S. Ct. at 1144 (quotation marks omitted). Among other things, the FAA added a new section 702 to FISA, which "supplements pre-existing FISA authority by creating a new framework" under which the government may conduct FISC-authorized surveillance of non-U.S. persons outside the United States. *Id.* The essential difference between section 702's requirements and those needed for a traditional FISA order is that section 702 does not require a probable-cause showing addressed to individual surveillance

targets, *Amnesty Int'l*, 133 S. Ct. at 1144—reflecting the fact that section 702 acquisitions may only target non-U.S. persons who are outside the United States and thus not protected by the Fourth Amendment. Instead of a probable-cause finding, section 702 requires the FISC to find, among other things, that the government's targeting procedures are reasonably designed to comply with the statute's requirements. 50 U.S.C. § 1881a(d), (g), (i). If a section 702 acquisition results in incidental collection of information concerning U.S. persons communicating with the target of the surveillance, the FAA, like the original FISA, requires the application of FISC-approved minimization procedures designed to prevent the unnecessary retention or dissemination of such information. *Id.* § 1881a(e), (g), (i). Section 702 surveillance "may not be intentionally targeted at any person known to be in the United States or any U.S. person reasonably believed to be located abroad." *Amnesty Int'l*, 133 S. Ct. at 1144-45; *accord* 50 U.S.C. § 1881a(b). Acquisitions must also comport with the Fourth Amendment, 50 U.S.C. § 1881a(b)(5), and are subject to oversight by the Legislative, Executive, and Judicial branches, *id.* § 1881a(f), (i), (*l*).

Information acquired under section 702 is "deemed to be" information acquired under traditional FISA electronic surveillance for the purpose of § 1806. 50 U.S.C. § 1881e(a). Thus, the use of information obtained or derived from Title VII collection is subject to the same notification requirements as information obtained or derived under the provisions of FISA Title I.

### 3.   The Government's Notification Practices Regarding Information Obtained or Derived from Both Traditional FISA and FAA Surveillance

Under § 1806(c) and § 1881e(a), then, the government must provide notice to any aggrieved person of its intent to use or disclose, in a proceeding against that person, information obtained or derived from a Title I or Title III collection of information, as well as a Title VII (FAA) collection.

3

In 2013, the government reviewed the question of whether information obtained or derived from a Title I or III collection could also be derived from a previous Title VII collection. In a document provided to the ACLU in connection with this case, and publicly filed in a criminal prosecution in which FISA-derived information was used, the government explained the history and results of its assessment of that question. *See* Gov't's Response to Def.'s Mot. for Full Discovery Regarding Surveillance, *United States v. Mohamud*, No. 10 Cr. 475 (D. Ore.), ECF no. 491 (Feb. 13, 2014) ("*Mohamud* Discovery Memo."), at 6-9 (attached to Declaration of Benjamin H. Torrance dated July 25, 2014 ("Torrance Decl.") as Ex. A). In that filing, DOJ noted that "[p]rior to recent months," it had "not considered the particular question of whether and under what circumstances information obtained through electronic surveillance under Title I or physical search under Title III could also be considered to be derived from prior collection under Title VII." *Id.* at 7. After a review, "the Department . . . determined that information obtained or derived from Title I or Title III FISA collection may, in particular cases, also be derived from prior Title VII collection, such that notice concerning both Title I/III and Title VII collections should be given in appropriate cases with respect to the same information." *Id.*

Thus, in *Mohamud*, for example, the government provided notice of its intent to use information obtained or derived from Title I and Title III collections at the outset of the criminal prosecution, well before DOJ's review of the issue. *Id.* at 1. At that time, however, the government "did not consider whether that same evidence was also 'derived,' as a matter of law, from prior FISA collection pursuant to Titles I, III, or VII." *Id.* at 7-8. Following DOJ's review in 2013, the government filed a supplemental notice due to its "determination . . . that certain evidence referenced in the original FISA notification, obtained or derived from Title I and Title III collection, was itself also derived from Title VII collection as to which defendant was

aggrieved." *Id.* at 1, 7-8. The supplemental notice thus stated that Title VII-derived information

had been used in that case. *Id.* at 2. In several other cases, as the government has disclosed to the

ACLU in this case, the government has filed similar Title VII notices.[1]

### B.   The ACLU's FOIA Requests and Lawsuit

On March 29, 2013, the ACLU submitted a FOIA request to DOJ, seeking

(1) The case name, docket number, and court of all legal proceedings, including criminal prosecutions, current or past, in which the Department of Justice intends or intended to enter into evidence, or otherwise used or disclosed in any trial, hearing, or other proceeding, any information obtained or derived from electronic surveillance pursuant to the authority of the FAA.

(2) Policies, procedures, and practices governing the provision of notice to "aggrieved persons," as set forth in 50 U.S.C. § 1881e(a) and § 1806( c), of the government's intent to enter into evidence or otherwise use or disclose in any trial, hearing, or other proceeding information obtained or derived from electronic surveillance pursuant to the authority of the FAA.

(3) Legal memoranda or opinions addressing or interpreting the FAA's notice provision or requirements, as set forth in 50 U.S.C. § 1881e(a) and § 1806(c).

Compl. ¶ 18; Declaration of Mark A. Bradley dated July 25, 2014 ("Bradley Decl.") ¶ 2. The

request was forwarded to seven DOJ components. Compl. ¶ 19.

In October 2013, the ACLU filed the complaint in this action, alleging that four of those

components—the National Security Division ("NSD"), the Executive Office for U.S. Attorneys

("EOUSA"), the Criminal Division, and the Federal Bureau of Investigation—had not complied

with FOIA. Compl. ¶¶ 23-27. Since the beginning of this action, the Criminal Division and the

FBI have informed the ACLU that they have located no responsive records. EOUSA and NSD

also sent the ACLU a joint response to part 1 of the FOIA request, and the ACLU has indicated

---

[1] By letter dated February 27, 2014, the government enclosed "the notices of intent [to use information as specified in § 1806(c)] that have been made public in" three cases: *Mohamud* (D. Ore.); *United States v. Hasbajrami* (E.D.N.Y.); and *United States v. Muhtorov* (D. Colo.). Since that date, the government has similarly filed notices in two other cases: *United States v. Khan* (D. Ore.) and *United States v. Mihalik* (C.D. Cal.).

that it does not now challenge any component's response regarding part 1. In addition, counsel

for the parties have reached agreement that EOUSA's initial search is to be limited to records in

the U.S. Attorney's Offices for the Districts of Colorado ("USAO/Colorado") and Oregon

("USAO/Oregon). Joint Status Letter dated Apr. 30, 2014 (ECF no. 11) at 1.[2]

On March 26, 2014, NSD finalized its response to the ACLU's requests 2 and 3 by sending

the ACLU a detailed index of five documents that NSD had identified as responsive to those

requests, but that were exempt from disclosure. The index indicated that the five documents were

withheld under FOIA's exemption 5, 5 U.S.C. § 552(b)(5), as they were covered by the

deliberative process privilege, attorney-client privilege, and attorney work-product privilege.

Bradley Decl. Ex. A. On April 2, 2014, the government responded to the request on behalf of the

USAO/Oregon, indicating that that office had located no responsive records in its unclassified

systems except those that had already been indexed and withheld by NSD; the response further

stated that the search of the classified systems had not been completed. On May 30, 2014, the

government responded on behalf of the USAO/Oregon regarding classified records, and the

USAO/Colorado regarding both unclassified and classified records; that response disclosed two

unclassified versions of classified memorandums of law that had been filed earlier that month in

the *Mohamud* (Oregon) and *Muhtorov* (Colorado) prosecutions. The response stated that no other

responsive records had been located.

Accordingly, as indicated in the joint status letter filed with this Court on April 30, 2014,

the issues remaining for resolution are, first, whether the searches for records conducted by NSD,

the USAO/Colorado, and the USAO/Oregon were sufficient to meet the requirements of FOIA;

---

[2] Because the ACLU has indicated it may seek to require searches in other USAOs, this
motion seeks only partial summary judgment, on all aspects of this action except that potentially
forthcoming request.

and second, whether NSD's invocation of exemption 5 to withhold the five responsive documents was proper.

## C.   DOJ's Searches for Responsive Records

### 1.   NSD

NSD received the request on April 9, 2013. Bradley Decl. ¶ 2. NSD construed requests 2 and 3 to seek only records that govern or bind the government, and thus to exclude drafts. *Id.* ¶ 8. NSD further construed request 2 to seek records stating a general rule or guidance regarding the provision of notice under the statutes referred to in the request, rather than the provision or non-provision of notice in a particular case. *Id.* ¶ 9. However, NSD interpreted the request not to require that a "polic[y], procedure[ ], [or] practice[ ]" be a stand-alone document, such that records in particular cases that state governing policies, procedures, or practices were deemed responsive. *Id.*

NSD initiated its search on November 8, 2013. Bradley Decl. ¶ 4. NSD's FOIA staff first determined that the Chief of Litigation within the Office of Intelligence ("OI") would be likely to possess responsive records. *Id.* ¶ 5. The Litigation Chief reviews and prepares requests to the Attorney General to permit use of FISA information when that authorization is required by statute. *Id.* ¶ 5. Under 50 U.S.C. § 1806(b), advance authorization of the Attorney General is required when the government intends to use FISA information in a criminal case—a broader category than that which would trigger the notice requirement under § 1806(c). Moreover, the Litigation Chief is familiar with OI's files and activities, and also familiar with NSD's and OI's practices, policies, and procedures regarding the notification requirement under traditional FISA and the FAA. Bradley Decl. ¶ 5. Accordingly, the Litigation Chief knew which records exist on these topics, and where they would be held. *Id.*

The OI Litigation Chief then conducted a search for responsive records, searching in both paper and electronic records. *Id.* ¶ 10. As her hard-copy files are organized by subject matter, she searched by hand within each subject area that pertained to FISA's use authority. *Id.* Based on intimate knowledge of the materials regarding the topic of use of FISA information, she also recalled potentially responsive records in her electronic files, which she retrieved, examined, and forwarded to the NSD FOIA staff. *Id.*

The OI Litigation Chief also directed the NSD FOIA staff to NSD's Office of Law and Policy ("OLP"), which had worked on FISA litigation projects that may have addressed the subjects of the FOIA request. *Id.* ¶ 6. OLP develops and implements DOJ policies regarding intelligence, counterterrorism, and other national security matters, and provides legal assistance and advice on matters of national security law. *Id.* The OI Litigation Chief was aware of several memorandums that had been written and researched by OLP attorneys pertaining to the authority to use FISA information. *Id.* The NSD FOIA staff thus contacted the Deputy Assistant Attorney General for OLP (i.e., the top official of that subcomponent), who identified four OLP attorneys who might have responsive records. *Id.* ¶ 11. Electronic and paper files of both the Deputy Assistant Attorney General and the four other attorneys found in subject-matter files with pertinent labels were then searched by hand, and the potentially responsive materials were given to the NSD FOIA staff. *Id.*

Having overseen these searches, NSD's FOIA staff considered potential other sources of records. Based on their knowledge of NSD's structure and responsibilities, and the information they had obtained by speaking with the people noted above, NSD's FOIA staff determined there were no other subcomponents of NSD that were likely to have responsive documents. *Id.* ¶ 12.

NSD then processed the potentially responsive materials obtained in the searches above. *Id.* ¶ 13. The documents were reviewed to determine if they were responsive to the FOIA requests. *Id.* NSD found five such documents. *Id.* NSD then assessed whether the documents were exempt from withholding under FOIA, and determined that, as explained below, all five were. *Id.*

### 2.    U.S. Attorney's Offices

As noted above, "[f]or present purposes, the parties have agreed that EOUSA's search will be limited to records in the" USAO/Colorado and USAO/Oregon. Joint Status Letter dated Apr. 30, 2014 (ECF no. 11) at 1. The FOIA requests were therefore referred to those two United States Attorney's Offices. Declaration of Zeyen J. Wu dated July 18, 2014 ("Wu Decl.") ¶ 3; Declaration of Charles F. Gorder, Jr. dated July 23, 2014 ("Gorder Decl.") ¶ 3.

In the USAO/Oregon, the search was conducted and coordinated by that office's National Security and Anti-Terrorism Coordinator—the Assistant United States Attorney responsible for prosecuting terrorism and national-security criminal cases, who is familiar with the *Mohamud* case in which a supplemental FAA notice was filed in 2013. Gorder Decl. ¶¶ 2-4; *supra* note 1. As National Security and Anti-Terrorism Coordinator, the Oregon AUSA was familiar with the records in the USAO/Oregon that would be potentially responsive to the FOIA requests. Gorder Decl. ¶ 4. Based on his knowledge of his office's records, their contents, their locations, and who might possess them, the Oregon AUSA proposed a search protocol to EOUSA and NSD. *Id.* ¶ 5. That search protocol consisted of a hand search of the USAO/Oregon's Criminal Procedures Manual—a document that would contain any policies, practices, or procedures regarding FISA or its notice provisions. *Id.* In addition, the proposed protocol including searching computer files of any USAO/Oregon AUSA who worked on any case identified as involving the use of FISA-obtained or -derived information. *Id.* The computer search included the terms "aggrieved,"

"1881e(a)" (i.e., the FAA provision incorporating the existing FISA notice requirement), "FAA," and "702" (i.e., the FAA provision authorizing surveillance). *Id.* This search protocol was agreed to by EOUSA and NSD, and ultimately followed by the USAO/Oregon. *Id.*

Accordingly, the USAO/Oregon identified seven AUSAs who could have handled a case involving FAA surveillance. *Id.* ¶ 6. Those AUSAs reviewed their case lists since July 2008 (which was when the FAA was enacted, *see* Pub. L. No. 110-261, 122 Stat. 2438) to determine if FAA-obtained or -derived information had been used or disclosed. Four AUSAs were determined to have been assigned to, or have been involved in, an FAA-related prosecutions. Gorder Decl. ¶ 8. The office then searched the unclassified computer systems of those AUSAs using the search terms specified above. *Id.* The search located approximately 191 documents and 1910 emails. *Id.* The Oregon National Security and Anti-Terrorism Coordinator then reviewed the documents to determine if they might be responsive to the FOIA requests. *Id.* After removing the duplicative documents and those that were not responsive, the USAO/Oregon determined that eight unique documents were possibly responsive. *Id.* Pursuant to an earlier arrangement, those possibly responsive documents were then forwarded to NSD for processing. *Id.* ¶¶ 7-8.

The USAO/Colorado proceeded similarly. The USAO/Colorado's National Security and Anti-Terrorism Coordinator was the only AUSA involved in the *Muhtorov* case, in which a supplemental FAA notice was filed. Wu Decl. ¶ 4; *supra* note 1. That AUSA also determined, based on his knowledge of the office's terrorism and national security cases, that he was the only person in the USAO/Colorado responsible for handling any case that used FAA-obtained or -derived information. Wu Decl. ¶ 4. Accordingly, he was the only person in the office with records potentially responsive to the request. *Id.* The AUSA received the USAO/Oregon's search protocol, described above, and determined that it was appropriate for his office's search as well.

*Id.* ¶¶ 7-8. He then conducted the search of unclassified computer systems with the assistance of USAO/Colorado staff. *Id.* ¶¶ 5, 7. The systems searched were the only ones that would contain responsive records. *Id.* ¶ 9. The search returned 31 unique files (some of which had other files attached). *Id.* ¶ 10. Pursuant to the same arrangement followed by the USAO/Oregon, the USAO/ Colorado transferred these potentially responsive records to NSD for further review. *Id.* ¶ 11.

Because both the USAO/Colorado and the USAO/Oregon lack the technical capacity to search computer systems containing classified national security information, they referred the searches of those systems to EOUSA. Wu Decl. ¶ 12; Gorder Decl. ¶ 9. The classified computer systems were then searched using the same computer search terms as described above for unclassified systems. Wu Decl. ¶ 12; Gorder Decl. ¶ 9. The results of those searches were then also sent to NSD for review. Wu Decl. ¶ 12; Gorder Decl. ¶ 9; Bradley Decl. ¶¶ 23-24.

Upon receiving the results of both the classified and unclassified searches, NSD's FOIA staff reviewed the records. Bradley Decl. ¶ 25. NSD found that two documents located in the USAO/Oregon had previously been found and withheld by NSD on that component's index. *Id.* ¶ 26. Another document, the *Mohamud* Discovery Memo., which set out the government's policy and practice regarding notice under 50 U.S.C. § 1881e(a) and the history of that practice's development, had previously been disclosed to the ACLU. *Id.* ¶ 27. Two further documents were disclosed. *Id.* ¶ 28. No further records were determined to be responsive. *Id.* ¶ 29.

**D.   Documents Indexed and Withheld**

The index attached to the Bradley Declaration describes five documents withheld by NSD. For each document, the index states the date (or approximate date); the sender and recipient if known; the number of pages; a description of the subject matter and contents of the record; and the applicable privileges. Bradley Decl. Ex. A. For all five documents, NSD maintained that the

records were exempt under FOIA because they are covered by the deliberative process privilege, attorney-client privilege, and attorney work product privilege. *Id.*

The Bradley Declaration elaborates the reasons for the withholdings on the basis of those three privileges. *Id.* ¶¶ 14-22. NSD explained that it determined that the documents numbered 1 to 4 were memorandums describing the views and recommendations of various DOJ components as part of a process to assist DOJ's decisionmaking regarding provision of notice under FISA and the FAA. *Id.* ¶ 17. Document number 5 is a memorandum setting out legal arguments and counterarguments on that same issue, also prepared as part of DOJ's decisionmaking process. *Id.* All five were predecisional, in that they preceded an ultimate DOJ decision on the question at issue, and deliberative, as they were part of the process of deliberation and exchange of ideas to facilitate decisionmaking. *Id.* NSD thus concluded that the documents are protected by the deliberative process privilege, and that their disclosure would impair the free flow of ideas and advice, thus harming the agency's decisionmaking process. One of the documents was determined to be covered by the privilege for the additional reason that it set out possible legal arguments and counterarguments before DOJ decided which arguments to advance, and the record played a role in that decision. *Id.* ¶ 18.

NSD further asserted work product privilege, as the five documents were prepared in anticipation of litigation in various criminal prosecutions in which FISA-derived information may be used and in which defendant may be expected to challenge that use and the scope or applicability of FISA's notification provisions. *Id.* ¶ 20. In addition, NSD asserted the attorney-client privilege, as the five memorandums consist of attorneys' views on questions of law, provided as confidential legal advice to DOJ decisionmakers. *Id.* ¶ 22.

# ARGUMENT

## A.  Legal Standards

"Upon request, FOIA mandates disclosure of records held by a federal agency, unless the documents fall within enumerated exemptions." *Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (citations omitted). Although these exemptions "have been consistently given a narrow compass," *id.* (quotation marks omitted), they are still "intended to have meaningful reach and application," *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989). Congress recognized that public disclosure is not always in the public interest, and struck "a balance . . . between the public's right to know and the government's legitimate interest in keeping certain information confidential." *Center for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 925 (D.C. Cir. 2003).

Most FOIA actions are resolved by summary judgment. *World Publishing Co. v. DOJ*, 672 F.3d 825, 832 (10th Cir. 2012); *Miscavige v. IRS*, 2 F.3d 366, 369 (11th Cir. 1993). Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a FOIA case, "[a]ffidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994) (footnote omitted). An agency's declarations in support of its determination are "accorded a presumption of good faith," and "[a]n affidavit from an agency employee responsible for supervising a FOIA search is all that is needed to satisfy Rule 56[ ]; there is no need for the agency to supply affidavits from each individual who participated in the actual search." *Id.* at 812, 814 (quotation marks omitted).

**B.   DOJ Properly Construed the FOIA Request**

A request for records must "reasonably describe[ ]" the requested records for FOIA's

disclosure obligation to be triggered. 5 U.S.C. § 552(a)(3). While an agency must "construe a

FOIA request liberally," *Nation Magazine v. U.S. Customs Service*, 71 F.3d 885, 890 (D.C. Cir.

1995), the terms of the request, and what the request reasonably describes, still control: an

"agency [is] bound to read it as drafted, not as either agency officials or [the requester] might

wish it was drafted." *Miller v. CIA*, 730 F.2d 773, 776-77 (D.C. Cir. 1984); *see Kowalczyk v.

DOJ*, 73 F.3d 386, 389 (D.C. Cir. 1996) (agency "not obliged to look beyond the four corners of

the request for leads to the location of responsive documents"); *Adamowicz v. IRS*, 552 F. Supp.

2d 355, 362 (S.D.N.Y. 2008) (government need not "respond to a search that is broader than the

one it received"); *Amnesty Int'l v. CIA*, 728 F. Supp. 2d 479, 498 (S.D.N.Y. 2010) ("agency has a

duty to construe FOIA requests liberally, [but] FOIA was not intended to reduce government

agencies to full-time investigators on behalf of requesters" (quotation marks, alterations, and

citations omitted)); *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 59, 64 (D.D.C. 2003)

("agency's obligation to search is limited to the four corners of the request"); *see also Weisberg

v. DOJ*, 705 F.2d 1344, 1353-55 & n.12 (D.C. Cir. 1983).

As noted above, the requests seek

(2) Policies, procedures, and practices governing the provision of notice to
"aggrieved persons," as set forth in 50 U.S.C. § 1881e(a) and § 1806( c), of the
government's intent to enter into evidence or otherwise use or disclose in any
trial, hearing, or other proceeding information obtained or derived from electronic
surveillance pursuant to the authority of the FAA.

(3) Legal memoranda or opinions addressing or interpreting the FAA's notice
provision or requirements, as set forth in 50 U.S.C. § 1881e(a) and § 1806(c).

Based on discussions among counsel, DOJ understands two aspects of its construction of these requests may be at issue. In both respects, DOJ reasonably construed them in accordance with its FOIA obligations.

First, DOJ construed the requests to seek final records, not draft documents. Bradley Decl. ¶ 8. Request 2 is clear that it only seeks records "governing" the Department's provision of notice under the named statutes. But draft documents do not "govern"; instead, " 'draft documents . . . reflect the personal opinions of the writer rather than the policy of the agency.' " *Tigue v. DOJ*, 312 F.3d 70, 80 (2d Cir. 2002) (quoting *Grand Central Partnership, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999)); *accord Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980); *Fox News Network, LLC v. Dep't of the Treasury*, 739 F. Supp. 2d 515, 559 (S.D.N.Y. 2010) (drafts reflect "only the tentative view of their authors; views that might be altered or rejected upon further deliberation either by their authors or by superiors"). As long as it has not been adopted as agency policy, a document like a draft is not "governing." *See Coastal States*, 617 F.2d at 866 (draft "can lose that status if it is adopted, formally or informally, as the agency position on an issue"), 869 ("Tentative opinions are not relied on as precedent; they are considered further by the decisionmaker."). Thus, NSD excluded from its search any draft document that was not in effect a "governing" "polic[y], procedure[ ], [or] practice[ ]." NSD furthermore read the two similar requests, 2 and 3, in tandem, and construed request 3 to also reach only final documents. Bradley Decl. ¶ 8.

DOJ notified the ACLU of this interpretation early on in the FOIA process—before the lawsuit was filed. A letter from DOJ's Office of Information Policy ("OIP"), responding to the FOIA request, stated: "With regard to items (2) and (3) of your request, we have interpreted your request as seeking final policies, opinions, and guidance concerning the Department's use of

evidence obtained from surveillance conducted under the Foreign Intelligence Surveillance Act Amendments Act of 2008." Torrance Decl. Ex. B (Letter from OIP to ACLU dated May 15, 2013). OIP advised the ACLU that its search would be limited accordingly, and expressly asked the ACLU to respond "[i]f our interpretation of your request is incorrect." *Id.* ACLU never responded. *Id.* ¶ 4. NSD was aware of this exchange, which confirmed its construction of request 3. Bradley Decl. ¶ 8. Having been put on notice of this construction of the request, and having failed to take advantage of the explicit invitation to offer a different interpretation, ACLU should not now be heard to argue that DOJ construed the request too narrowly.

Second, DOJ construed request 2 as seeking general rules or guidelines, rather than records reflecting the provision of notice under FISA in the specific circumstances of a particular case. Bradley Decl. ¶ 9.[3] This reasonable interpretation follows the language of request 2 itself. The terms "policies" or "procedures" cannot under any definition cover records reflecting the provision of notice in a specific case. Nor does the request for "practices" cover specific instances, as that term implies a habitual, repeated, or customary way of doing things. *See* Am. Heritage Dict. (5th ed.) (def. 1: "habitual or customary action or way of doing something"). Indeed, that is the only natural and plausible reading, especially in light of the "commonsense canon" that "a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294-95 (2008). In conjunction with "policy" and "procedure," words that imply general applicability, "practice" "is most sensibly read" to have the same implication. *Id.* Finally, the request's limitation to records "governing" the provision of notice conclusively confirms DOJ's interpretation: the provision of notice in one case cannot be said to "govern" the provision of notice in any other case.

---

[3] DOJ's understanding is that there is no contention that a "legal memorandum," under request 3, could seek an application of the notice provisions in a particular case.

**C.   DOJ's Search for Responsive Records Complied with FOIA**

Having properly interpreted the request, DOJ then searched for responsive records. The declarations submitted with this motion demonstrate that that search was adequate and lawful.

An agency meets its burden to show its search was adequate simply by submitting an affidavit that is "relatively detailed and nonconclusory, and submitted in good faith." *Grand Central*, 166 F.3d at 489; *accord New York Times, Inc. v. DOJ*, __ F.3d __, No. 13-422, 2014 WL 2838861, at *19 (2d Cir. June 23, 2014). Courts may rely on "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). "The adequacy of a search is not measured by its results, but rather by its method." *New York Times*, 2014 WL 2838861, at *19; *accord Hodge v. FBI*, 703 F.3d 575, 579-80 (D.C. Cir. 2013). Thus, when a FOIA requester challenges the search, the question is "whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant." *Grand Central*, 166 F.3d at 489 (quotation marks omitted); *accord Electronic Privacy Information Center v. NSA*, 678 F.3d 926, 933-34 (D.C. Cir. 2012) (standard is "good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested" (quotation marks omitted)). The presumption of good faith that attaches to agency affidavits cannot be rebutted by "purely speculative claims about the existence and discoverability of other documents." *Grand Central*, 166 F.3d at 489 (quotation marks omitted); *accord Carney*, 19 F.3d at 813.

"[A]n agency's search need not be perfect, but rather need only be reasonable." *Grand Central*, 166 F.3d at 489. An "extraordinary effort" to search is "not required by the FOIA"; only "reasonable efforts" need be made. *Goland v. CIA*, 607 F.2d 339, 369-70 (D.C. Cir. 1979) (on

reh'g); *accord id.* at 352-53; *see Halpern v. FBI*, 181 F.3d 279, 288 (2d Cir. 1999) ("agency need not conduct a search that plainly is unduly burdensome"). "There is no requirement that an agency search every record system," only those that "are likely to turn up the information requested." *Oglesby*, 920 F.2d at 68; *accord Campbell v. DOJ*, 164 F.3d 20, 28 (D.C. Cir. 1998) ("the agency has discretion to confine its inquiry to a central filing system if additional searches are unlikely to produce any marginal return").

DOJ's searches in this case meet these standards. Far from the "perfunctory" searches that courts have rejected, *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999), the searches here at the various DOJ subcomponents were thorough and reasonable.

First, NSD and the two USAOs were reasonable in deciding where to search. NSD began by asking the Chief of the Litigation Section within the Office of Intelligence where responsive records may be found. Bradley Decl. ¶ 5. On its face, it was reasonable to ask the Litigation Chief, where the FOIA request seeks records about litigation practices, in the Office of Intelligence, when the subject matter of the litigation practices is intelligence gathering, where to find the pertinent records. That conclusion is bolstered by the fact that the Litigation Section reviews and prepares requests to use FISA information—a broader category than that which triggers the notice requirement—and the Chief of Litigation is familiar with the OI's files, understands its activities, and is knowledgeable about OI's and NSD's relevant policies, practices, and procedures. *Id.* As NSD averred in its declaration, the Chief of Litigation is the person who "knew precisely which types of records exist on these topics, and where they would be held." *Id.* The Chief of Litigation then directed NSD FOIA staff to the Office of Law and Policy, knowing that some memorandums had been written and researched in that office. *Id.* ¶ 6. NSD followed through on the lead, meeting with OLP attorneys and the Deputy Assistant

Attorney General for that office, who identified four OLP attorneys who might have potentially responsive records. *Id.* ¶¶ 7, 11. Having surveyed these attorneys, all knowledgeable about the subject matter and NSD's work, and having considered NSD's structure, NSD determined that no other people or offices were likely to possess responsive records. *Id.* ¶ 12.

The USAOs were also reasonable in deciding where to search. In both offices, the requests were referred to the respective AUSAs who served as National Security and Anti-Terrorism Coordinators and who had been personally involved in two of the small number of cases in which an FAA supplemental notice had been provided. Wu Decl. ¶ 3-4; Gorder Decl. ¶¶ 2-3. In Oregon, that AUSA then consulted the seven AUSAs who could have handled an FAA-related case, and those AUSAs reviewed their cases lists to identify cases where FAA-obtained or -derived information may have been used. Gorder Decl. ¶ 6. The files of the four AUSAs who were assigned or involved in an FAA-related matter were then searched. *Id.* ¶ 8-9. In Colorado, the AUSA determined that he was the only person in the office who could have responsive records, so his files were then searched. Wu Decl. ¶ 4, 7, 9, 12.

Second, both NSD and the USAOs were reasonable in determining how to search. NSD proceeded by having individual, knowledgeable attorneys search their own files, both paper and electronic, by hand. Bradley Decl. ¶¶ 10-11. All the attorneys organized their files by subject matter, and they searched the records within the pertinent subject matters to determine if any were responsive. *Id.* ¶ 11; *see Church of Scientology of California v. IRS*, 792 F.2d 146, 151 (D.C. Cir. 1986) ("the [agency] would doubtless be within the law in restricting its search to files whose subjects indicate a connection with [the requester]"). This type of by-hand search is expressly contemplated as adequate in the FOIA statute. 5 U.S.C. § 552(a)(3)(D) ("the term 'search' means to review, *manually or by automated means*, agency records for the purpose of

locating those records which are responsive to a request" (emphasis added)). Accordingly, courts have repeatedly upheld similar manual searches of the locations where records are most likely to be found. *E.g.*, *Amnesty Int'l v. CIA*, No. 07 Civ. 5435, 2008 WL 2519908, at *2, 4, 6, 9, 15 (S.D.N.Y. June 19, 2008); *Cooper v. Stewart*, 763 F. Supp. 2d 137, 143 (D.D.C.), *aff'd*, 2011 WL 6758484 (D.C. Cir. 2011); *Elliott v. U.S. Dept. of Agriculture*, 506 F. Supp. 2d 1, 4 (D.D.C. 2007), *aff'd*, 2008 WL 4682666 (D.C. Cir. 2008); *Dockery v. Gonzales*, 524 F. Supp. 2d 49, 53-54 (D.D.C. 2007); *Fitzgibbon v. U.S. Secret Service*, 747 F. Supp. 51, 54 (D.D.C. 1990).

The USAOs, on the other hand, searched by "automated means." 5 U.S.C. § 552(a)(3)(D). The search protocol was developed by the USAO/Oregon's Anti-Terrorism Coordinator, an attorney who is knowledgeable about the FAA and FAA- and FISA-related prosecutions, as well as about his office's records that might be responsive to the requests, their contents, their locations, and who might possess them. Gorder Decl. ¶¶ 2-5. The search terms encompassed reasonably expected terms, and the search was performed on computer systems of the relevant personnel. *Id.* ¶¶ 5-9. Similarly, the USAO/Colorado search was conducted by a knowledgeable AUSA, also the office's Anti-Terrorism Coordinator, who reviewed the USAO/Oregon's search protocol, determined it was appropriate for his office, and applied it to his own records as the only person in the office responsible for FAA-related matters. Wu Decl. ¶¶ 3-12. These searches meet the standards of adequacy and reasonableness described above.

**D.   The Records Were Properly Withheld Under Exemption Five**

Finally, NSD's declaration establishes that it properly considered the privileges applicable to the responsive documents, and withheld them under exemption 5.

Exemption 5 exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C.

§ 552(b)(5). That language "incorporate[s] . . . all the normal civil discovery privileges."
*Hopkins v. HUD*, 929 F.2d 81, 84 (2d Cir. 1991); *accord Renegotiation Bd. v. Grumman Aircraft
Engineering Corp.*, 421 U.S. 168, 184 (1975). "Stated simply, agency documents which would
not be obtainable by a private litigant in an action against the agency under normal discovery
rules (*e.g.*, attorney-client, work-product, executive privilege) are protected from disclosure
under Exemption 5 . . . ." *Tigue*, 312 F.3d at 76 (citation omitted).

### 1.   The Deliberative Process Privilege Applies

Exemption 5 encompasses the " 'deliberative process' or 'executive' privilege, which
protects the decisionmaking processes of the executive branch in order to safeguard the quality
and integrity of governmental decisions." *Hopkins*, 929 F.2d at 84; *accord Klamath*, 532 U.S. at
8-9 ("officials will not communicate candidly among themselves if each remark is a potential
item of discovery and front page news"); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150-51
(1975) ("those who expect public dissemination of their remarks may well temper candor with a
concern for appearances . . . to the detriment of the decision making process" (quotation marks
omitted)). Legal advice, like other advisory opinions, "fits exactly within the deliberative process
rationale for Exemption 5." *Brinton v. Department of State*, 636 F.2d 600, 604 (D.C. Cir. 1980);
*see National Council of La Raza v. DOJ*, 411 F.3d 350, 356-57 (2d Cir. 2005).

An agency record must satisfy two criteria to qualify for the deliberative process privilege:
it "must be both 'predecisional' and 'deliberative.' " *Grand Central*, 166 F.3d at 482 (citations
omitted); *accord Tigue*, 312 F.3d at 76–77. A document is "predecisional" when it is "prepared
in order to assist an agency decisionmaker in arriving at his decision." *Grumman*, 421 U.S. at
184 (*quoted in Tigue*, 312 F.3d at 80; *Grand Central*, 166 F.3d at 482; *Hopkins*, 929 F.2d at 84).
While a document is predecisional if it "precedes, in temporal sequence, the 'decision' to which

it relates," *Grand Central*, 166 F.3d at 482, the government need not "identify a specific decision" made by the agency to establish the predecisional nature of a particular record, *Sears*, 421 U.S. at 151 n.18; *accord Tigue*, 312 F.3d at 80. So long as the document "was prepared to assist [agency] decisionmaking on a specific issue," it is predecisional. *Tigue*, 312 F.3d at 80.

"A document is 'deliberative' when it is actually related to the process by which policies are formulated." *Grand Central*, 166 F.3d at 482 (quotation marks and alteration omitted). In determining whether a document is deliberative, courts inquire whether it "formed an important, if not essential, link in [the agency's] consultative process," whether it reflects the opinions of the author rather than the policy of the agency, and whether it might "reflect inaccurately upon or prematurely disclose the views of [the agency]." *Id.* at 483; *accord Hopkins*, 929 F.2d at 84. Predecisional deliberative documents include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Tigue*, 312 F.3d at 80 (quotation marks omitted). The privilege "focus[es] on documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.' " *Hopkins*, 929 F.2d at 84-85 (quoting *Sears*, 421 U.S. at 150).

The privilege applies to the five documents at issue in NSD's index. Bradley Decl. Ex. A. As shown in the index and explained in the declaration, the documents were produced as "part of a process to assist the Department's decisionmaking regarding provision of notice under FISA and the FAA." *Id.* ¶ 17, Ex. A. The records were part of the process that has been publicly described by DOJ, in a document provided to the ACLU in this case: in "recent months," DOJ considered for the first time "the particular question of whether and under what circumstances information obtained through electronic surveillance under Title I or physical search under Title

III could also be considered to be derived from prior collection under Title VII." *Mohamud* Discovery Memo. at 7. That review resulted in DOJ's determination that "information obtained or derived from Title I or Title III FISA collection may, in particular cases, also be derived from prior Title VII collection, such that notice concerning both Title I/III and Title VII collections should be given in appropriate cases with respect to the same information." *Id.* The withheld memorandums here were part of the deliberations leading to that determination.

All five were predecisional, as they "preceded an ultimate decision" on the question being considered. Bradley Decl. ¶ 17, Ex. A. All five were deliberative, as they "were part of the deliberative process [and] part of the exchange of ideas and suggestions that accompanies careful and reasoned decisionmaking." *Id.* Documents 1, 2, and 4 are memos from DOJ components, reflecting only those components' advice and recommendations, their contributions to the DOJ-wide deliberations. *Id.* Ex. A. Document 3 reflects a meeting at which the issues were discussed and deliberated. *Id.* And document 5 spells out potential legal arguments and counterarguments, and positions the government might take, on the same issues being deliberated. *Id.* ¶ 18, Ex. A. These are precisely the types of "recommendations, . . . proposals, suggestions, and other subjective documents which reflect . . . personal opinions . . . rather than the policy of the agency," *Tigue*, 312 F.3d at 80, and whose disclosure would inhibit "frank discussions" and thereby injure "the quality of agency decisions," *Sears*, 421 U.S. at 150-51. They are accordingly privileged.

## 2.  The Attorney-Client Privilege Applies

Exemption 5 also incorporates the attorney-client privilege. *La Raza*, 411 F.3d at 360; *In re Grand Jury Investigation*, 399 F.3d 527, 533 (2d Cir. 2005). "The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtain-

ing or providing legal assistance. Its purpose is to encourage attorneys and their clients to communicate fully and frankly and thereby to promote 'broader public interests in the observance of law and administration of justice.' " *In re Country of Erie*, 473 F.3d 413, 418 (2d Cir. 2007) (quoting *Upjohn v. United States*, 449 U.S. 383, 389 (1981) (citation omitted)). It operates in the government context as it does between private attorneys and their clients, "protect[ing] most confidential communications between government counsel and their clients that are made for the purpose of obtaining or providing legal assistance." *Id.* "To invoke the attorney-client privilege, a party must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *Id.* at 419. A lawyer's recommendations regarding policies to comply with or implement legal obligations is privileged legal advice as well. *Id.* at 422.

Again, this privilege applies to the NSD documents. The documents consist of legal advice, including policy advice regarding the government's best practices for implementation of its obligations, from the authors (or in the case of document 3, the meeting participants) to the personnel who formulate and implement policy for the client, the United States. Bradley Decl. ¶ 22; Ex. A. On their faces, they consist of communications between counsel and client. *Id.* And they were intended to be, and in fact kept, confidential. *Id.* Disclosure would represent an intrusion into the attorney-client relationship, impeding the government's efforts to obtain and utilize full and frank legal advice to ensure its observance of the law. *County of Erie*, 473 F.3d at 418. Exemption 5 thus applies.

### 3.   The Work Product Privilege Applies

Exemption 5 also encompasses the attorney work product privilege. *Sears*, 421 U.S. at 154-55. That doctrine protects documents "prepared in anticipation of litigation," as well as "mental

24

impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3); *accord A. Michael's Piano, Inc. v. FTC*, 18 F.3d 138, 146 (2d Cir. 1994). Without such protection, an entity would have to choose between "scrimp[ing] on candor and completeness" or disclosing its "assessment of its strengths and weakness . . . to litigation adversaries." *United States v. Adlman*, 134 F.3d 1194, 1200 (2d Cir. 1998). There is no requirement that litigation exist at the time a protected document is created; documents may be considered work product when created with the reasonable belief of future litigation. *See, e.g.*, *Upjohn Co.*, 449 U.S. at 388, 397.

The privilege applies here. All five records consist of materials prepared by attorneys in anticipation of litigation. Bradley Decl. ¶ 20. That anticipation was clearly reasonable, as DOJ was prosecuting several cases in which FAA-derived information had been or would be used at trial against aggrieved persons, and subsequently filed supplemental FAA notices to that effect. *See supra* note 1.[4] The five memorandums set out the conclusions, opinions, and legal theories of attorneys concerning positions that may be taken in that litigation. Bradley Decl. ¶ 20; *see Sears*, 421 U.S. at 154 ("Whatever the outer boundaries of the attorney's work-product rule are, the rule clearly applies to memoranda prepared by an attorney in contemplation of litigation which set forth the attorney's theory of the case and his litigation strategy."). The work product doctrine therefore protects the withheld documents under exemption 5.

## Conclusion

Summary judgment should be granted to the government.

---

[4] Although the actual occurrence of litigation is not necessary to the privilege, in fact DOJ's position was challenged in court in both the *Mohamud* and *Muhtorov* cases.

Dated:      New York, New York            Respectfully submitted,
            July 25, 2014

                                          PREET BHARARA
                                          United States Attorney for the
                                          Southern District of New York
                                          Attorney for Defendants

                                   By:    /s/ Benjamin H. Torrance
                                          BENJAMIN H. TORRANCE
                                          Assistant United States Attorney
                                          86 Chambers Street
                                          New York, New York 10007
                                          Telephone: 212.637.2703
                                          Fax: 212.637.2702
                                          E-mail: benjamin.torrance@usdoj.gov