## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

AMERICAN CIVIL LIBERTIES UNION et al,   )
  )
     Plaintiffs,   )
  )
     v.   )       Civil Action No. 13-cv-7347(GHW)
  )
UNITED STATES DEPARTMENT OF JUSTICE,   )
  )
  )
     Defendant.   )

## DECLARATION OF JOHN W. KORNMEIER

Pursuant to 28 U.S.C. § 1746, I, John W. Kornmeier, declare the following to be a true and correct statement of facts:

1. I am an Attorney Advisor with the Executive Office for United States Attorneys ("EOUSA"), United States Department of Justice ("DOJ"). In that capacity, my responsibilities include acting as liaison with other divisions and offices of DOJ in responding to requests and litigation filed under both the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a ("PA"), reviewing FOIA/PA requests for access to records located in this office and the ninety-four United States Attorneys' Offices ("USAOs") and the case files arising therefrom, reviewing correspondence related to requests, reviewing searches conducted in response to requests, locating responsive records, and preparing EOUSA responses to ensure that determinations to withhold or release such responsive records are in accordance with FOIA, PA, and DOJ regulations, 28 C.F.R. §§ 16.3 et seq. and §§ 16.40 et seq.

2. As an Attorney Advisor of the FOIA/PA Unit, EOUSA, I have the authority to release and withhold records requested under the FOIA/PA. The statements I make in this Declaration are based upon my review of the official files and records of EOUSA, my own personal knowledge, and

information acquired by me through the performance of my official duties.

3. Due to the nature of my official duties, I am familiar with the procedures followed by this office in responding to the FOIA/PA request(s) made to EOUSA. This declaration addresses the FOIA request made by the Plaintiff, the American Civil Liberties Union (ACLU).

4. The ACLU requested the following:

> 1. The case name, docket number, and court of all legal proceedings, including criminal prosecutions, current or past, in which the Department of Justice intends or intended to enter into evidence, or otherwise used or disclosed in any trial, hearing, or other proceeding, any information obtained or derived from electronic surveillance pursuant to the authority of the FAA.

> 2. Policies, procedures, and practices governing the provision of notice to "aggrieved persons," as set forth in 50 U.S.C. § 1881e(a) and 1806(c), of the government's intent to enter into evidence or otherwise use or disclose in any trial, hearing, or other proceeding information obtained or derived from electronic surveillance pursuant to the authority of the FAA.

> 3. Legal memoranda or opinions addressing or interpreting the FAA's notice provision or requirements, as set forth in 50 U.S.C. § 1881e(a) and 1806(c).

5. At ACLU's request, EOUSA initially searched two USAOs, the districts of Colorado and Oregon for responsive records.

6. In the initial summary judgment proceedings, ACLU challenged the adequacy of the search and applications of exemptions to withhold documents found in those two districts. The Court upheld the search procedures and application of the exemptions, but held that the search had been improperly limited in one respect.

7. The ACLU then asked EOUSA to perform two distinct searches in the balance of the USAOs.

8. For the following four districts, the ACLU asked for a search for items numbers 2 & 3 of the request: the Southern District of California, the Southern District of Florida, the Northern District of Illinois and the Eastern District of New York.

9. For the balance of the USAOs (88 districts), the ACLU requested that EOUSA perform the

following targeted search:

> *In the United States Attorney's Offices: Searches for any version of the "FISA-derived guidance" and documents addressing that guidance.*
>
> *(Date range defining the scope of search: July 2008 to present).*

## SEARCHES

10. When first receiving a FOIA request, EOUSA must make certain decisions on how to proceed with the search. Some requests are straight forward such as a prisoner asking for all the records on himself. In such cases EOUSA forwards the request to the USAOs which search in their case management databases under the name of the requester.

11. When EOUSA receives a request such as the one at issue which is for a range of material not specifically tracked by the USAOs, it must develop a unique search protocol tailored to that request.

12. The most important step in the development of that protocol and fundamental to the execution of a successful search is the decision as to which individuals would have the knowledge and experience to know how and where to search.

13. Upon receipt of ACLU's request, EOUSA decided that the best persons to contact and direct the searches were the Anti-Terrorism Advisory Council (ATAC) Coordinators. ATAC Coordinators are Assistant United States Attorneys stationed in the USAOs. They are intimately involved in overseeing and prosecuting international terrorism cases as well as others with national security implications. As such they are the ones who would be familiar with all the Foreign Intelligence Surveillance Act (FISA) notice provisions on which the ACLU is seeking information.

### Searches in the Four Districts

14. For the previous search of the districts of Colorado and Oregon, EOUSA sent the ACLU request to the ATAC Coordinators of those two districts, as previously detailed in declarations submitted to this Court, and as upheld by the Court's order regarding summary judgment.

3

15. Those ATAC Coordinators used four search terms to search electronic files: "aggrieved," "1881e(a)," "FAA," and "702" .

16. For the second phase of searching, of the four districts which were to search for items 2 & 3 of the ACLU request, EOUSA contacted the ATAC Coordinators and asked them to proceed with the search. Since the search terms and methodology used by the districts of Oregon and Colorado had been upheld by the Court, EOUSA suggested they use the same terms and methodology. They did and forwarded the documents to EOUSA. EOUSA reviewed the documents and determined which to withhold under the appropriate FOIA exemption. Each of these ATAC Coordinators has prepared a search declaration which is attached to this declaration; see Exhibits A-D. EOUSA arranged for a separate search of classified email systems using the same email custodians and search terms that the ATAC Coordinators used for the non-classified systems in their respective districts. These searches found no responsive documents.

**Searches of the Remaining 88 Districts**

17. For the searches of the remaining 88 districts, EOUSA again contacted the ATAC Coordinators. In this instance, since the search was narrowly targeted to specific documents or versions of those documents, EOUSA did not suggest the use of the same four terms as for the other four districts. Instead, EOUSA attached different samples of the documents to its request to search.

18. There is a great variation among the 88 districts; some are dense urban areas and others are mostly rural. As a result the breadth of the searches which they had to perform varied significantly, but the approaches were similar. EOUSA relied on the ATAC Coordinators' knowledge and experience to decide how best to implement the searches.

19. EOUSA asked each ATAC Coordinator to keep notes and to forward how he or she performed the search. Rather than submit 88 separate declarations on this narrow search, this declaration summarizes the approaches based on the ATAC Coordinators' descriptions.

20. The ATAC Coordinators, because they oversee and are involved in terrorism and national

4

security cases are aware of which other individuals may have records concerning FISA notice, in which systems records may be stored, and which terms would most likely retrieve the records. The ATAC Coordinators are also the ones who receive correspondence regarding FISA notice from the National Security Division and other components of the Department of Justice.

21. The ATAC Coordinators generally took the following approach in conducting their searches:

a. they identified those individuals who might have records;

b. they identified the systems in which to perform the search; and

c. they selected the search terms to use.

22. The ATAC Coordinators identified AUSAs involved in terrorism and national security matters as individuals whose emails should be searched. They used terms and combinations of search terms such as "FISA", "FISA" and "derived memorandum", and "FISA" and "derived guidance". In some districts the ATAC Coordinators kept a specific file for FISA records. The number of individuals whose email systems were searched varied significantly depending on the size of the district. The ATAC Coordinators searched their own emails as a prime source of records and as indicative of who else would have records. They identified any other systems in which responsive records might be stored.

23. Upon completion of the searches, the ATAC Coordinators forwarded the records to EOUSA. EOUSA reviewed the documents and determined which to withhold under the appropriate FOIA exemption.

## APPLICATION OF EXEMPTIONS

24. EOUSA withheld records under Exemption (b)(5) of the FOIA. This Exemption protects documents that fall under the privileges recognized in civil discovery.

25. The two privileges which EOUSA asserts are deliberative process and attorney work-product.

26. The application of these privileges to specific documents is found in the Vaughn Index attached as Exhibit E. Each document listed in the Vaughn Index is deliberative and pre-decisional. Each document is prepared in anticipation of litigation. These documents are part of a decision-making process among various components of the Department of Justice in preparation and anticipation of litigation involving the notice provisions of the FISA. EOUSA examined each document to determine if there was any non-exempt information it could reasonably segregate. EOUSA found no such information.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 20th day of November, 2015

John W. Kornmeier

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

AMERICAN CIVIL LIBERTIES UNION, et al.,

        Plaintiffs,             13 Civ. 7347 (GHW)

     v.

UNITED STATES DEPARTMENT OF JUSTICE,  **DECLARATION OF**
                          **CHRISTOPHER K. VEATCH**
        Defendant.

------------------------------------------------------------------x

    I, Christopher K. Veatch, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge in the course of my employment, hereby declare as follows relating to the above-titled matter:

    1.    I am the Chief of the National Security and Cybercrimes Section in the United States Attorney's Office for the Northern District of Illinois (NDIL). I am also the NDIL's Anti-Terrorism Advisory Council (ATAC) Coordinator. I have served in both capacities since approximately April 2012 and have otherwise served as an Assistant United States Attorney with the NDIL since May 2005.

    2.    As the Chief of the National Security and Cybercrimes Section and the ATAC Coordinator, I am responsible for prosecuting and supervising the prosecution of criminal cases involving international terrorism and other criminal matters with national security implications.

    3.    On or about June 10, 2015, I was informed by the Executive Office for the United States Attorneys (EOUSA) that the ACLU had requested certain records



GOVERNMENT
EXHIBIT

_A_

pursuant to the Freedom of Information Act – the request that is the subject of the above-captioned lawsuit. EOUSA further informed me that counsel for the government in this lawsuit and the ACLU had agreed to make a specific request for records within certain United States Attorney's Offices, including the NDIL.

4.     As the Chief of the National Security and Cybercrimes Section and the ATAC Coordinator, I am generally familiar with the kinds of materials within the NDIL that potentially could be responsive to the FOIA request, as well as the current and former NDIL personnel who may have possessed such materials.

5.     Beginning in June 2015, I coordinated a search for potentially responsive materials using, what I understand to be, a search procedure previously upheld by the Court, namely, conducting searches of electronic unclassified electronic files and emails for the following terms – "aggrieved," "1881e(a)," "FAA," and "702." The search protocol included:

a.     Identifying current and former NDIL personnel who, since July 2008, had been involved with any matter in which information was collected pursuant to the FISA Amendments Act of 2008 (FAA), or who may have received any training, documents, guidance, or other information relating to electronic surveillance conducted pursuant to the FAA.

b.     After personnel who potentially possessed responsive materials were identified, such individuals' unclassified files and current and archived emails were searched using the above-referenced search terms. In general, current employees conducted searches of their own files and emails. The files and emails of

former employees and current employees without availability were searched by paralegals assigned to this project.

       c.     After potentially responsive documents and emails were identified and placed on a shared drive, I went through all of the materials to determine which, if any, were responsive to the FOIA request. I determined that many of the results were duplicative, and most were not responsive. Once I finished this review, I forwarded the potentially responsive materials to EOUSA for review.

     6.     Based on my familiarity with the kinds of materials within the NDIL that could be responsive to the FOIA request, it was my understanding that hard copies of such materials, which were not duplicative of electronic files, were unlikely to exist in employees' files. Regardless, employees conducting searches of their electronic files and emails were also tasked with identifying potentially responsive materials from their hard copy files. No such materials were identified.

     7.     The search conducted by the NDIL did not include searches of the Department of Justice's classified computer systems (known as JCON-S and JCON-TS). It is my understanding that searches of NDIL personnel's JCON-S and JCON-TS systems were to be conducted by personnel at Main Justice. The NDIL provided EOUSA with the names of personnel with potentially responsive records in the JCON-S and JCON-TS systems.

8.      Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: Chicago, Illinois
        November 19, 2015

By:  _____
     Christopher K. Veatch
     Chief, National Security and
        Cybercrimes Section
     Coordinator, Anti-Terrorism
        Advisory Council
     United States Attorney's Office
     Northern District of Illinois

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

AMERICAN CIVIL LIBERTIES UNION, et al.,

               Plaintiffs,

     v.

UNITED STATES DEPARTMENT OF JUSTICE,

               Defendant.

------------------------------------------------------------x

13 Civ. 7347 (GHW)

**DECLARATION OF
BRIAN K. FRAZIER**

I, Brian K. Frazier, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge in the course of my employment, hereby declare as follows relating to the above-titled matter:

1.    I am currently the Chief of the National Security Section in the United States Attorney's Office for the Southern District of Florida (USAOSDFL).   I am also the USAOSDFL's Anti-Terrorism Advisory Council (ATAC) Coordinator.  I have served in both administrative capacities since March 2013 and have otherwise served as an Assistant United States Attorney (AUSA) in the USAOSDFL since January 2000.

2.    As the Chief of the National Security Section and the ATAC Coordinator, I am responsible for prosecuting criminal cases involving international terrorism and other criminal matters with national security implications.  I am also familiar with similar cases handled by other AUSAs in the USAOSDFL, and am aware of every criminal prosecution in this office that utilized information obtained or derived from surveillance under the authority of the FISA Amendments Act, 50 U.S.C. § 1881e (FAA) or where such information was the subject of



litigation, whether or not the FAA was actually utilized and whether or not any prosecution information was obtained or derived from surveillance authorized under it.

3.  On or about June 10, 2015, I was informed by the Executive Office for the United States Attorneys (EOUSA) that the ACLU had requested certain records pursuant to the Freedom of Information Act—the request that is the subject of the above-captioned lawsuit.  EOUSA further informed me that counsel for the government in this lawsuit and the ACLU had agreed to make a specific request for records within certain United States Attorney's Offices, including the USAOSDFL.

4.  Because I am the Chief of the National Security Section and the ATAC Coordinator, I was asked to coordinate this search for records within the USAOSDFL.  As the Chief of the National Security Section and the ATAC Coordinator, I am familiar with the kinds of records in the USAOSDFL potentially responsive to the FOIA request.

5.  In response, based on the ACLU's request and my knowledge of the records that might be responsive to that request within the USAOSDFL, their contents, their locations, and who might possess them, in early June 2015 I spearheaded a search for this information using a search procedure previously upheld by the court. The search terms for the computer systems were "aggrieved," "1881e(a)," "FAA," and "702."  Our search protocol consisted of searching the computer files of any USAOSDFL AUSA who worked on any case since July 2008 identified as involving the use of information obtained or derived from the FAA or where such information, regardless of whether it exists, was placed at issue through defense motions or requests for such information.  It was not likely that any responsive documents would exist in paper form that did not also exist electronically, and thus an electronic search was deemed sufficient.

2

6.     In early June 2015, I tasked Senior Intelligence Specialist Angel Martinez and Paralegal Specialist Jennifer Aguila, both with the National Security Section, with searching the computer databases of those who, based upon their unit assignments in the USAOSDFL and their security clearances, could have handled a case involving FAA surveillance.   I had previously reviewed each AUSA's case list from July 2008 and identified any case where notice was given of intent to use or where the USAOSDFL actually had used or disclosed evidence obtained or derived from electronic surveillance pursuant to the FAA or where such information, regardless of whether it exists, was placed at issue through defense motions or requests for such information.

7.     I directed Mr. Martinez and Ms. Aguila to work with our systems manager and search our unclassified computer systems for documents and emails in the account of seven AUSAs, including myself, who either were assigned to an FAA-related prosecution or otherwise had some involvement in such a matter.   The four terms used for this search were the following: "aggrieved," "1881e(a)," "FAA," and "702."   As a result of that search, I received a series of downloads to a shared drive and email.   On July 13, 2015, I went through all of these documents and emails to determine which, if any, were responsive to the request for FAA-related documents.   I determined that many of the results were duplicative, and most were not responsive to the FOIA request.   Once I finished this determination, I forwarded responsive records to EOUSA for review.

8.     The USAOSDFL lacks the technical capacity to search its classified computer systems (known as JCON-S and JCON-TS).   Accordingly, it is my understanding that searches of our JCON-S and JCON-TS systems were to be conducted by personnel at Main Justice.   The USAOSDFL informed EOUSA of the names of the persons in the USAOSDFL with potentially

3

responsive records in the JCON-S and JCON-TS systems and provided Main Justice personnel

with the search terms "aggrieved," "1881e(a)," "FAA," and "702."

9.      Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury

that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated:  Miami, Florida
        November 17, 2015

By: _____
    Brian K. Frazier
    Chief, National Security Section
    Coordinator, Anti-Terrorism Advisory Council
    United States Attorney's Office
    Southern District of Florida

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

AMERICAN CIVIL LIBERTIES UNION, et al.,

                Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF JUSTICE,

                Defendant.

------------------------------------------------------------x

13 Civ. 7347 (GHW)

**DECLARATION OF
JOHN N. PARMLEY**

I, John N. Parmley, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge in the course of my employment, hereby declare as follows relating to the above-titled matter:

    1.    I am currently the Chief of the National Security and Cybercrimes Section (NSCS) in the United States Attorney's Office for the Southern District of California (USACAS). I am also the USACAS's Anti-Terrorism Advisory Council (ATAC) Coordinator. I have served in both administrative capacities since March 2015 and have otherwise served as an Assistant United States Attorney (AUSA) in the USACAS since April 1998. Prior to becoming Chief, I worked for approximately 6 years as an attorney in NSCS over two different time periods.

    2.    As the Chief of NSCS and the ATAC Coordinator, I am responsible for prosecuting criminal cases involving international terrorism and other criminal matters with national security implications. I am also familiar with similar cases handled by other AUSAs in the USACAS, and am generally aware of every criminal prosecution in this office that utilized information obtained or derived from surveillance under the authority of the FISA Amendments



Act, 50 U.S.C. § 1881e (FAA) or where such information was the subject of litigation, whether or not the FAA was actually utilized and whether or not any prosecution information was obtained or derived from surveillance authorized under it.

3.    In approximately June, 2015, I was informed by the Executive Office for the United States Attorneys (EOUSA) that the ACLU had requested certain records pursuant to the Freedom of Information Act—the request that is the subject of the above-captioned lawsuit. EOUSA further informed me that counsel for the government in this lawsuit and the ACLU had agreed to make a specific request for records within certain United States Attorney's Offices, including the USACAS.

4.    Because I am the Chief of NSCS and the ATAC Coordinator, I was asked to coordinate this search for records within the USACAS. As the Chief of NSCS and the ATAC Coordinator, I am familiar with the kinds of records in the USACAS potentially responsive to the FOIA request. Additionally, I consulted with the two most recent Chiefs of NSCS, whose tenure covered the time in question, to identify all potential AUSAs who may have worked on a case involving the requested information. We identified ten AUSAs who may have had responsive information.

5.    Based on the ACLU's request and my knowledge of the records that might be responsive to that request within the USACAS, their contents, their locations, and who might possess them, in early June 2015 I spearheaded a search for this information using a search procedure previously upheld by the court. The search terms for the computer systems were "aggrieved," "1881e(a)," "FAA," and "702." Our search protocol consisted of searching the computer files of the ten previously identified USACAS AUSAs who worked on any case since July 2008 identified as potentially involving the use of information obtained or derived from the

FAA or where such information, regardless of whether it exists, was placed at issue through defense motions or requests for such information.

6.      In early June 2015, I provided a list to our Information Technology ("IT") department of the ten AUSAs identified above. I requested that the IT department perform a search on the electronic files (including emails) of those AUSAs and provide me with the results. The four terms used for this search were the following: "aggrieved," "1881e(a)," "FAA," and "702." As a result of that search, I received a series of downloads to a shared drive. Additionally, I asked all of the previously identified AUSAs who were still employed at the USACAS to physically search their space for any paper documents which were potentially responsive to the request. In June and July 2015, I went through all of these documents and emails to determine which, if any, were responsive to the request for FAA-related documents. I determined that many of the results were duplicative, and most were not responsive to the FOIA request. Once I finished this determination, I forwarded all potentially responsive records to EOUSA for review.

7.      The USACAS lacks the technical capacity to search its classified computer systems (known as JCON-S and JCON-TS). Accordingly, it is my understanding that searches of our JCON-S and JCON-TS systems were to be conducted by personnel at Main Justice. The USACAS informed EOUSA of the names of the persons in the USACAS with potentially responsive records in the JCON-S and JCON-TS systems and provided Main Justice personnel with the search terms "aggrieved," "1881e(a), "FAA," and "702."

//

//

3

8.     Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury

that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated:  San Diego, California
        November 10, 2015

By: _____
    John N. Parmley
    National Security and Cybercrimes Section
    United States Attorney's Office
    Southern District of California

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

AMERICAN CIVIL LIBERTIES UNION, et al.,

                Plaintiffs,

     v.

UNITED STATES DEPARTMENT OF JUSTICE,

                Defendant.

------------------------------------------------------------x

13 Civ. 7347 (GHW)

DECLARATION OF
ZAINAB AHMAD

I, Zainab Ahmad, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge in the course of my employment, hereby declare as follows relating to the above-titled matter:

1.     I am currently the Deputy Chief of the National Security & Cybercrime Section in the United States Attorney's Office for the Eastern District of New York (EDNY). I am also the EDNY's Anti-Terrorism Advisory Council (ATAC) Coordinator. I have served in both administrative capacities since March 2013 and have otherwise served as an Assistant United States Attorney (AUSA) in the EDNY since October 2008.

2.     As the Deputy Chief of the National Security & Cybercrime Section and the ATAC Coordinator, I am responsible for prosecuting criminal cases involving international terrorism and other criminal matters with national security implications. I am also familiar with similar cases handled by other AUSAs in EDNY, and am aware of every criminal prosecution in this office that utilized information obtained or derived from surveillance under the authority of the FISA Amendments Act, 50 U.S.C. § 1881e (FAA) or where such information was the subject of litigation, whether or not the FAA was actually utilized and whether or not any prosecution information was obtained or derived from surveillance authorized under it.



GOVERNMENT
EXHIBIT

D

3.      In or around mid-June  2015, I was informed by the Executive Office for the United States Attorneys (EOUSA) that the ACLU had requested certain records pursuant to the Freedom of Information Act—the request that is the subject of the above-captioned lawsuit. EOUSA further informed me that counsel for the government in this lawsuit and the ACLU had agreed to make a specific request for records within certain United States Attorney's Offices, including EDNY.

4.      Because I am the Deputy Chief of the National Security Section and the ATAC Coordinator, I was asked to coordinate this search for records within EDNY.  As the Deputy Chief of the National Security Section and the ATAC Coordinator, I am familiar with the kinds of records in the EDNY potentially responsive to the FOIA request.

5.      In response, based on the ACLU's request and my knowledge of the records that might be responsive to that request within the EDNY, their contents, their locations, and who might possess them, in late June 2015 I spearheaded a search for this information using a search procedure previously upheld by the court. The search terms for the computer systems were "aggrieved," "1881e(a)," "FAA," and "702."   Certain terms were searched individually and others were searched in pairs, depending on our analysis of which method was likely to yield responsive results.  Our search protocol consisted of searching the computer files of any current or former EDNY prosecutor who worked within the National Security & Cybercrime Section and had a security clearance sufficient to have handled a case involving FAA surveillance from July 2008 onwards and of any current or former EDNY prosecutor who had a security clearance sufficient to have handled a case involving FAA surveillance and may have been involved in or supervised any matter since July 2008 identified as involving the use of information obtained or

derived from the FAA or where such information, regardless of whether it exists, was placed at issue through defense motions or requests for such information.

6.     Beginning in late June 2015, I coordinated with Mary Breen, EDNY's Deputy Administrative Officer, regarding the technical aspects of the search of the files of the prosecutors described above.  Ms. Breen used EDNY compiled a list of said prosecutors and discussed with our Information Technology specialists the necessity to obtain access to former prosecutors' emails and electronic files.  We did not develop a search protocol for paper files because any files regarding the use of information obtained or derived from FAA surveillance that existed in EDNY's paper files would also exist in EDNY's electronic files, and therefore the search of EDNY's electronic files would yield all responsive documents in EDNY's possession.

7.     With respect to prosecutors who were currently working within EDNY's National Security & Cybercrime Section, I directed them to work with our Information Technology specialists and search our unclassified computer systems for documents and emails in their accounts.  The four terms used for this search were the following: "aggrieved," "1881e(a)," "FAA," and "702."  The prosecutors were directed to cull those emails and documents, if any, which were responsive to the request for FAA-related documents.  They were directed to save the results of their search to a share drive.  I reviewed the results placed therein and determined that many of the results were duplicative, and many were not responsive to the FOIA request. Once I finished this determination, I forwarded responsive records to EOUSA for review.

8.     With respect to prosecutors who were no longer working within EDNY's National Security & Cybercrime Section, Ms. Breen directed the Information Technology specialists to make their emails and electronic documents accessible to Lead Legal Administrative Specialist Dorla Henriquez for review.  Ms. Henriquez then searched those files

3

using the following four search terms: "aggrieved," "1881e(a)," "FAA," and "702." She saved the results of those searches to a share drive. I reviewed the results of those searches to determine which, if any, were responsive to the request for FAA-related documents. I forwarded the responsive, non-duplicative, records to EOUSA for review.

9.     EDNY lacks the technical capacity to search its classified computer systems (known as JCON-S and JCON-TS). Accordingly, it is my understanding that searches of our JCON-S and JCON-TS systems were to be conducted by personnel at Main Justice. The USAOSDFL informed EOUSA of the names of the persons in the USAOSDFL with potentially responsive records in the JCON-S and JCON-TS systems and provided Main Justice personnel with the search terms "aggrieved," "1881e(a), "FAA," and "702."

10.     Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: Brooklyn, New York
       November 20, 2015

By: _____
       Zainab Ahmad
       Deputy Chief, National Security Section
       Coordinator, Anti-Terrorism Advisory Council
       United States Attorney's Office
       Eastern District of New York

4

# VAUGHN INDEX

## Glossary

AGAC– Attorney General Advisory Committee

AUSA – Assistant United States Attorney

CYBER – Cyber/Intellectual Property Subcommittee

ODAG – Office of Deputy Attorney General

TNSS – Terrorism and National Security Subcommittee

USA – United States Attorney

USA plus letters for districts indicate U.S. Attorneys' Offices (e.g., USACAE = United States Attorney's Office for the Eastern District of California, VT (Vermont), OR (Oregon), USAEO (Executive Office), etc.)


GOVERNMENT
EXHIBIT
E

ACLU v. DOJ, 13 Civ. 7347 (S.D.N.Y.)
Documents Withheld in Full by Executive Office for U.S. Attorneys, August 2015

| Doc. No. | Date | From/To | Pages | Subject/Description | Exemption/Privilege |
|---|---|---|---|---|---|
| 1 | March 30, 2015 | AUSA from USAVT to USAEO, AGAC-Cyber | 1 | Internal email comments on draft FISA-Derived memorandum, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 2 | April 8, 2015 | AUSA Chief, National Security to USACAC Acting USA and First AUSA | 4 | Memo analyzing draft FISA "Derived" memorandum, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 3. | Undated | Unknown | 4 | Memo (no letterhead, no to/from fields) titled "White Paper: The Meaning of FISA Derived" which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 4. | July 17, 2013 | TNSS, AGAC to ODAG; Office of the Solicitor General to unspecified | 14 | Scanned version of documents 1 and 4 from Feb. 2014 index of withheld documents, with draft notice pleading attached | (b)(5): deliberative process privilege; work product |
| 5. | Undated | Unknown | 3 | Segment of analysis memo (no letterhead, no to/from fields) addressing potential counterarguments to draft internal memorandum addressing FISA, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 6. | April 10, 2015 | AUSA, USACAC to AUSA, USACAC, forwarded to AUSA, USACT | 2 | Email analysis and comment addressing draft internal FISA-Derived memorandum, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 7. | January 23, 2015 | USA of USACAE to various USAs and others | 2 | Email analysis and comments addressing draft internal memorandum on "Process Guidance for USAOs on Handling FISA", which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 8. | January 23, 2015 | U.S. Air Force Lt. Colonel to USA of USACAE and AUSAs | 2 | Email analysis and comments addressing draft internal FISA-Derived memorandum, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 9. | January 22, 2015 | AUSA, USACAE to USA of USACAE and various AUSAs, USACAE | 1 | Email analysis and comments addressing internal draft memorandum "Process Guidance for USAOs on Handling FISA", which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |

| | | | | |
|---|---|---|---|---|
| 10. | January 26, 2015 | USA of USANYW to various USAs | 1 | Email analysis and comments addressing draft internal draft memorandum, "Process Guidance for USAOs on Handling FISA", which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 11. | July 16, 2010 | USA of USAVAE to various USAs | 3 | Email analysis and comments addressing draft internal FISA-Derived memorandum, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 12. | July 31, 2013 | AUSA, USADC to various AUSAs, USADC | 4 | Email discussion of recent conference call about how to handle FISA-Derived issues and an analysis and comments addressing draft internal FISA-Derived memorandum, and memoranda on compound FISA issues, and on notice in FISA cases, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 13. | April 11, 2014 | AUSA, USADC to various AUSAs, USADC | 1 | Email analysis and comments addressing draft internal FISA-Derived memorandum, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 14. | Undated | Unknown | 10 | Memo (no letterhead, no to/from fields) titled "U.S. Attorneys' Comments on Draft 'FISA Derived' Guidance," which was prepared in anticipated of litigation; draft memorandum dated March 2015 is attached. | (b)(5): deliberative process privilege; work product |
| 15. | Undated | Unknown | 3 | Draft memo (no letterhead, no to/from fields) titled "Process Guidance for USAOs on handling FISA-Derived Issues," which was prepared in anticipated of litigation | (b)(5): deliberative process privilege; work product |
| 16. | June 29, 2012 | USA of USAVAE to various USAs | 1 | Email analysis and comments addressing draft internal FISA-Derived memorandum, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 17. | Undated | Unknown | 4 | Segment of memo (no letterhead, no to/from fields) titled "U.S. Attorneys' Comments on Draft 'FISA Derived' Guidance," which is was prepared in anticipated of litigation | (b)(5): deliberative process privilege; work product |
| 18. | February 2015 | Unknown | 38 | Draft Memorandum to All Federal Prosecutors, 'Determining Whether Evidence Is "Derived From" Surveillance Under Title III Or FISA', which was prepared in anticipation of litigation Date and From fields left blank; no letterhead. | (b)(5): deliberative process privilege; work product |

2

| # | Date | From/To | No. | Description | Privilege |
|---|------|---------|-----|-------------|-----------|
| 19. | January 23, 2015 | USA of USAOR to various USAs | 2 | Email analysis and comments addressing draft internal memorandum, "Process Guidance for USAOs on Handling FISA", which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 20. | January 26, 2015 | USA of USANYW to various USAs | 1 | Email analysis and comments addressing draft internal memorandum, "Process Guidance for USAOs on Handling FISA", which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 21. | Undated | Unknown | 4 | Memo entitled "FISA Derived" (no letterhead, no to/from fields) containing analysis and comments addressing draft memorandum of "FISA-Derived Guidance; which was created in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 22. | Undated | Unknown | 4 | Memo entitled "FISA Derived" (no letterhead, no to/from fields) containing analysis and comments addressing draft memorandum of "FISA-Derived Guidance; which was created in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 23. | Undated | Unknown | 4 | Memo (no letterhead, no to/from fields) titled "White Paper: The Meaning of FISA Derived" which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 24. | June 29, 2012 | USA of USAVAE to various USAs | 2 | Email analysis and comments addressing and attaching drafts of "FISA-Derived Guidance" memos, which were created in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 25. | Undated | Unknown | 4 | Memo (no letterhead, no to/from fields) titled "Considerations for Input on NSD FISA-Derived Memorandum," which was created in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 26. | July 16, 2010 | USA of USAVAE to various USAs | 2 | Email Internal comments on draft FISA-Derived memorandum, which was prepared in anticipation of litigation; draft memorandum and FISA derived White Paper are attached. | (b)(5): deliberative process privilege; work product |
| 27. | Undated | Attorney General to Federal Prosecutors | 2 | Draft memorandum (no letterhead) titled "Policy on the Use or Disclosure of FAA Information" which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 28. | Undated | Attorney General to Federal Prosecutors | 4 | Draft memorandum (no letterhead) titled "Guidance Regarding Whether Information Is Derived from FISA," which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |

3

| | | | | |
|---|---|---|---|---|
| 29. | Dec. 3, 2010 | Deputy Assistant Attorney General to USAs | 15 | Email attaching draft memorandum of "FISA-Derived Guidance" from Attorney General to all Prosecutors and supporting draft memorandum, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 30. | July 21, 2015 | AUSA to USA, ILN | 10 | Memo titled "FISA and FAA Primer/Issues," discussing FISA issues, including in specific cases, prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 31. | July 16, 2013 | Criminal Division to ODAG and other DOJ components | 2 | Email comments and analysis regarding FISA-derived issues, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 32. | July 13, 2013 | Criminal Division to the Office of the Attorney General and other DOJ components | 2 | Email comments and analysis regarding FISA-derived issues, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 33. | March 24, 2014 | ODAG to USAs | 30 | Email attaching and discussing draft memorandum (no letterhead, from and date fields blank) titled "Determining Whether Evidence Is 'Derived From' Surveillance Under Title III or FISA," which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 34. | July 17, 2013 | TNSS, AGAC to ODAG | 14 | Email attaching two copies of document #4 from Feb. 2014 index of withheld documents | (b)(5): deliberative process privilege; work product |
| 35. | July 16, 2013 | USAEO to Various USAs forwarding Email from ODAG to the Office of Solicitor General and other components | 7 | Email requesting review of document #1 from Feb. 2014 index of withheld documents | (b)(5): deliberative process privilege; work product |
| 36. | December__, 2013 | AUSA NYE to AUSAs NYE | 17 | Draft memorandum (date marked "December __, 2013") regarding use of FISA information, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 37. | July 16, 2013 | USA WAW to Various USAs | 5 | Email analysis and comment regarding FISA-Derived issues, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |

4

| | | | | |
|---|---|---|---|---|
| 38. | March 25, 2015 | AUSA NJ to AUSA NJ | 3 | Email comments on draft memorandum of "FISA-Derived Guidance"., attached, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 39. | July 16, 2013 | USA NJ to Various AUSAs | 1 | Email requesting review of document #1 from Feb. 2014 index of withheld documents | (b)(5): deliberative process privilege; work product |
| 40. | July 16, 2013 | USA NJ to Various AUSAs NJ | 4 | Email forwarding request for comments on three draft memos, attached, concerning FISA-derived issues, which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 41. | March 25, 2014 | USA NJ to Various AUSAs | 2 | Email requesting comments on draft memorandum, attached, of "FISA-Derived Guidance," which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 42. | January 31, 2015 | USA NJ to Various AUSAs | 6 | Email comments on draft memorandum (file name, "Process Guidance for USAOs") which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 43. | January 31, 2015 | USA NJ to Various USAs | 3 | Email comments on draft memorandum (file name, "Process Guidance for USAOs") which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 44. | January 31, 2015 | USA NJ to Various USAs | 2 | Email comments on attached draft memorandum (file name, "Process Guidance for USAOs") which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |
| 45. | March 25, 2014 | AUSA NJ to USA NJ | 2 | Email comments on draft memorandum of "FISA-Derived Guidance," which was prepared in anticipation of litigation | (b)(5): deliberative process privilege; work product |